UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERTO CAMACHO, JR., | : | CIVIL NO: 1:14-CV-01428 |
| | : | |
| Plaintiff | : | |
| | : | (Judge Kane) |
| v. | : | |
| | : | (Magistrate Judge Schwab) |
| R.L. DEAN, *et al.*, | : | |
| | : | |
| Defendants | : | |

## REPORT AND RECOMMENDATION

## I. Introduction.

The plaintiff, Roberto Camacho, Jr., through counsel, filed a complaint complaining about events and conditions at the State Correctional Institution at Huntingdon (SCI-Huntingdon).   Camacho later filed a motion for a preliminary injunction seeking confidential contact visits with his attorney.   After a hearing, we now recommend that the motion for a preliminary injunction be denied.

## II. Background and Procedural History.

Camacho names the following individuals as defendants: (1) R.L. Dean, a kitchen steward; (2) Mr. Hoover, a kitchen steward; (3) Mr. Parks, a kitchen supervisor; (4) Mr. Cook, a unit manager; (5) Paula C. Price, a corrections health care administrator; and (6) Tabb Bickell, the former Superintendent at SCI-Huntingdon.

Camacho alleges that in October of 2012, while he was working in the kitchen at SCI-Huntingdon, defendant Dean, suddenly and without warning, slammed the lid to a pot down on Camacho's left arm.   Camacho had recently had surgery on his left arm, and, according to Camacho, as a result of defendant Dean slamming the lid on his arm, his sutures burst and his surgical wound opened.   Although Camacho was bleeding, defendants Dean and Hoover refused to allow him to go to the medical department for treatment.

After Camacho filed a grievance about Dean's actions, Dean allegedly threatened Camacho and verbally and harassed him.   Also, according to Camacho, on several occasions when conducting pat searches, Dean forcibly struck Camacho in the testicles by running his fist up the inside of Camacho's leg.   Although Camacho alleges that he was afraid to file another grievance against Dean, he alleges that he did verbally report the purported sexual abuse to defendant Parks.   Later, defendant Cook interviewed Camacho about the incident.   According to Camacho, neither Parks nor Cook made the notifications required by DC-ADM 001.   Instead, they scheduled Camacho to work on a different shift from Dean, which, Camacho contends, served to conceal Dean's abusive behavior, to communicate to Dean that Parks and Cooks condoned such behavior, and to enable Dean to continue to abuse and intimidate Camacho.

2

Camacho alleges that, after Dean's assault with the pot lid, his arm did not heal properly and an outside specialist as well as contract medical staff at SCI-Huntingdon recommended that he have further surgery.   But, according to Camacho, defendant Price refused to approve that surgery, and Camacho did not heal properly and he suffered additional pain, tingling, and numbness.   Camacho alleges that defendant Bickell refused to speak to him about the abuse he suffered and his need for further surgery.

In July of 2014, Camacho underwent reparative surgery at SCI-Pittsburgh, but, Camacho alleges, he did not receive appropriate post-surgical care at SCI-Pittsburgh and officers there abused him causing further injury to his arm.

The complaint contains four counts.   Count 1 is an Eighth Amendment claim of excessive force against defendant Dean.   Count 2 is an Eighth Amendment medical claim against defendants Parks, Hoover, and Price.   Count 3 is a First Amendment retaliation claim against defendant Dean.   And Count 4 contains failure to supervise claims under the First and Eighth Amendments against defendants Parks, Cook, and Bickell.   Camacho seeks compensatory and punitive damages as well as declaratory relief and injunctive relief in the form of an order for adequate medical care.

3

The defendants filed a motion to dismiss the complaint, but after a conference with the Court, they agreed to withdraw that motion without prejudice given that Camacho anticipated filing an amended complaint.

On October 23, 2014, Camacho filed a motion for a preliminary injunction asking the Court to enjoin the Superintendent at SCI-Huntingdon from refusing to permit his counsel to confer with him in a space suitable for confidential contact visits.   More specifically, Camacho seeks a space where he and his counsel "may confidentially discuss the conduct of this case, review legal documents together, and exchange legal papers, while being shielded from having their conversations overheard or their papers viewed by high-resolution overhead surveillance cameras." *Doc. 13* at 4.   On November 13, 2014, Camacho filed a brief in support of his motion for a preliminary injunction and a proposed order.   He states that SCI-Huntingdon has refused his counsel's requests for confidential contact visits. He also notes that his counsel always requests a "confidential contact visit" where she can review papers with him without being overheard, but the shift commander ordered the visiting room officer not to admit his counsel unless she says either "I request a legal visit in the general visiting area" or "I request a legal visit in an attorney room." *Doc. 17* at 7 n.1.   Camacho asserts that he needs to talk with his counsel about sexual abuse and intimidation as well as events that have happened

since he filed the complaint in this case and which may require amendment of the complaint. Camacho asserts that his right of access to the courts includes a right to communicate privately with his attorney unimpeded by a barrier.

Briefing on the motion for a preliminary injunction was extended after Camacho's counsel filed a motion for a preliminary injunction raising similar issues regarding confidential attorney visits at SCI-Huntingdon in a different case—*Lane v. Tavares,* 3:14-CV-00991 (M.D. Pa.)—and Judge Caputo scheduled a hearing on the motion in that case. In order to ensure consistency while fairly considering this case on the merits, we ordered the defendants to address in their brief in opposition to the motion for a preliminary injunction in this case the evidence presented at the hearing in front of Judge Caputo in the *Lane* case and any ruling that Judge Caputo made in that case. In order to allow the defendants time to obtain the transcript of the hearing in *Lane,* we extended the deadline for them to file a brief in opposition to the motion for a preliminary injunction in this case until December 16, 2014.

On December 16, 2014, which was before Judge Caputo ruled in the *Lane* case, the defendants filed a brief in opposition to the motion for a preliminary injunction in this case. They argue that the Court should deny the motion because Camacho failed to establish an actual injury to his right of access to the court because the Court has not dismissed any of Camacho's claims in this case and he

remains free to amend or supplement his complaint.   The defendants further assert

that the motion should be denied because the Department of Corrections has

legitimate penological interests—safety and security—for its visiting policies,

because there are multiple alternate means for Camacho to have confidential

communications with his counsel, and because granting the motion would harm the

Department.[1]

On December 30, 2014, Camacho filed a reply brief contending that he is seeking

to restore the *status quo* regarding attorney visits before his counsel began to provide

legal assistance to him.   He contends that the *status quo* is defined by DC-ADM

812, which provides that attorneys are subject to the same rules and regulations as

other visitors and that inmates in general population are permitted contact visits,

defined as "[v]isits in a setting in which the inmate and visitor are permitted limited

physical contact and are not separated by security barriers or control systems." *Doc.*

---

[1]   The defendants also assert that the Court should deny the motion for a
preliminary injunction because Camacho failed to establish a violation of his limited
right to privacy.   Camacho, however, has disavowed any reliance on a right to
privacy. *Doc. 30* at 18 ("Defendants labor to refute an argument plaintiff never
made: that his right to *privacy* was violated.   This mistake persists in defendants'
brief even though it was addressed at the November 25 hearing [in the *Lane* case] by
plaintiff's counsel.   In fact, plaintiff asserts not a privacy right but a Constitutional
right of access to the courts.")(emphasis in original; citations omitted).   Thus, we do
not address any privacy right, and we limit our analysis to the right of access to the
courts.

*30* (quoting DC-ADM 812).   Camacho points out that DC-ADM 812 further

provides that "[t]he confidentiality of the attorney/client relationship will be

honored.   Personnel will not be stationed in such a manner as to be able to overhear

normal conversation . . . ." *Id.* Camacho asserts that SCI-Huntingdon has infringed

upon his right of access to the court by failing to permit him to have confidential

contact visits with his counsel, and, if he continues to be denied such visits, he will

be irreparably harmed.   He also asserts that the balance of equities favors the Court

issuing the preliminary injunction that he seeks.

On February 3, 2015, Judge Caputo denied the motion for a preliminary

injunction in the *Lane* case.[2]   He held that, on the record before him, Lane failed to

demonstrate a reasonable probability of success on the merits of his access-to-courts

claim:

> SCI-Huntingdon's policy appears to reasonably respond to
> legitimate institutional concerns posed by confidential contact
> visitation between an inmate and attorney in a private room:
> prevention of assault and the introduction of contraband.
> Specifically, on the evidence of record, SCI-Huntingdon's

---

[2]   Camacho notes in his reply brief that in addition to the motion for a preliminary
injunction regarding confidential contact visits at SCI-Huntingdon filed in the *Lane*
case, his counsel also filed a similar motion in the Court of Common Pleas of
Huntingdon County in *Cooper v. Dept. of Corrections,* No. 2010-1814.   Although
Camacho has not provided a copy of the decision in the *Cooper* case, we understand
that the Court of Common Pleas has since denied that motion for a preliminary
injunction.

> policy has a rational connection to legitimate government
> interests and there has been no indication that obvious, easy
> alternatives exist to the policy that would accommodate Lane's
> request at *de minimis* costs.   Balancing these factors with the
> lack of evidence regarding the policy's impact on others, and
> noting that Lane retains at least some access to the court, he fails
> to demonstrate a reasonable probability that he will succeed on
> his claim that the denial of contact visits with his attorney in a
> private room violates his constitutional right of access to the
> court.

*Lane v. Tavares*, No. 3:CV-14-991, 2015 WL 435003, at *11 (M.D. Pa. Feb. 3,

2015).   Judge Caputo also found that Lane failed to demonstrate that he will suffer

irreparable injury in the absence of a preliminary injunction because the evidence

demonstrated that Lane can speak confidentially with his counsel during contact

visits at SCI-Huntingdon by using the game table.  *Id.*   He further concluded that

"the availability for Lane and his attorney to use the non-contact booths further

counsel against finding that Lane will be irreparably harmed absent preliminary

injunctive relief." *Id.* at *12.   Finally, Judge Caputo noted what he was not

deciding:

> In so holding that Lane is not entitled to a preliminary injunction,
> I need not, and have not, determined that Commonwealth
> Defendants' regulation relating to confidential contact visits
> between an inmate and his attorney at SCI–Huntingdon is
> constitutional, and the constitutionality of that regulation
> remains unanswered.   Instead, I find only for purposes of the
> preliminary injunctive relief requested by Lane, in light of the
> evidence of record in this case, that he fails to satisfy his burden
> of demonstrating a reasonable probability that he will prevail on

the merits of his access to the courts claim or that he will suffer
irreparable harm if his motion is not granted.

*Id.* at *13.

Following Judge Caputo's decision in the *Lane* case, Camacho filed a motion
to compel the production of videos.[3]  In connection with that motion, the
defendants argued that Judge Caputo's decision in *Lane* collaterally estopped
Camacho from litigating the issue regarding the conditions for attorney-client visits
at SCI-Huntingdon.  At a March 27, 2015 conference with counsel, we rejected that
collateral estoppel argument because Camacho was not a party, or in privity with a
party, in the *Lane* case.  After that conference, we also scheduled a hearing on
Camacho's motion for a preliminary injunction.  Further, we granted Camacho's
motion to compel production to the extent that we ordered the defendants to produce
subpoenaed videos from visits on September 14, 2014, October 23, 2014, and
November 10, 2014.  We further granted Camacho's request for the video of
January 17, 2015 to the extent such video existed, and we granted Camacho's
request for his counsel to take photographs of the visiting booths at
SCI-Huntingdon.  We denied the motion to compel production to the extent it

---

[3] This was Camacho's second motion to compel production.  His first such motion
was denied without prejudice given that the motion for a preliminary injunction was
still pending in the *Lane* case.

sought sanctions and costs, and we also denied Camacho's request for video of August 30, 3014.

On May 22, 2015, we held a status conference with counsel to go over witnesses and to prepare for the upcoming hearing.   At that conference, Camacho's counsel asserted that the defendants had not produced all the videos that the Court had ordered them to produce, and she requested spoliation sanctions.   We directed counsel to raise the issue by a motion, and two days before the hearing, Camacho filed a motion titled "Motion in Limine for Findings of Fact and Sanctions" seeking spoliation sanctions.   By a separate order, we have denied that motion.[4]

Prior to the hearing, Camacho's counsel filed another proposed order in connection with his motion for a preliminary injunction.   In this proposed order, Camacho sought not only to have confidential contact visits at SCI-Huntingdon with his attorney, but that the visits be in compliance with DC-ADM 812 and that compliance be monitored by a disinterested party, who would be chosen by the Court and who would submit quarterly reports to the Court.

On May 28 and 29, 2015, we held a hearing on the motion for a preliminary injunction.   Following the hearing, we ordered the parties to file, on or before July

---

[4] Even were we to apply a inference of spoliation, that would not change our recommendation that the motion for a preliminary injunction be denied.

10

1, 2015, proposed findings of facts and conclusions of law.   The parties filed their proposed findings of fact and conclusions of law, and the motion for a preliminary injunction is ripe for decision.

### III.   The Preliminary Injunction Hearing.

Eleven witnesses testified at the hearing on Camacho's motion for a preliminary injunction, and numerous exhibits, including video clips and photographs, were presented at the hearing.   We briefly summarize that testimony and evidence.

#### 1. Roberto Camacho.

Camacho, like the other inmate witnesses, testified by videoconference.   While looking at a diagram of the visiting room at SCI-Huntingdon, *see Camacho Exhibit 8,* Camacho identified the visiting room as having a game table, chairs for general seating, noncontact visiting rooms, and a changing area in which inmates change from regular clothes into jumpsuits. *Doc. 84* at 11-12.   Camacho testified about the procedure he goes through before and after a visit: he goes to a changing area adjacent to the visiting room; while someone watches, he changes from his regular institutional clothes into a jumpsuit and he puts on different shoes; he is searched; upon completion of his visit, he checks in with an officer; he then leaves the general visiting area; in the

changing area, he changes from his visitation jumpsuit back into his regular institution clothes, at which time he is again searched by an officer. *Id.* at 12-13.

Camacho testified that prior to the hearing, he received from his attorney a packet in the mail containing grievances that he had filed. *Id.* at 13.   Those grievances relate to his visits at SCI-Huntingdon with his counsel. *See Camacho Exhibit 1.*   On September 14, 2014, Camacho met with his counsel at the game table in the visiting room, and according to Camacho, he could not talk with his counsel because at times he could not hear and at other times there was someone close by that could hear what was being said. *Doc. 84* at 13-14.   Camacho's counsel showed a series of still photos taken from video surveillance of that visit. *See Camacho Exhibit 16.*   They show Camacho and his counsel sitting at the game table and talking while many people walk by, or near, the game table. *Id.*   Camacho testified that it was a problem when visitors coming out of the restroom walk by the game table because they can hear what is being said and look at the papers on the table. *Doc 84* at 19.[5]

---

[5]   To support his assertion that others can hear the conversation between him and his counsel, Camacho testified that once another inmate told him that he needed a lawyer and that a visitor had told him that she heard what Camacho and his counsel were talking about. *Doc. 84* at 20.   The defendants objected to this testimony as hearsay. *Id.* Although we reserved ruling on that objection, the testimony is inadmissible hearsay because it is being offered for the truth of the matter asserted, i.e., that the visitor heard what was being discussed by Camacho and his counsel at the game table.

Camacho next testified about a visit with his counsel at SCI-Huntingdon on
October 23, 2014. *Id*. at 20.   This visit ended quickly because other individuals were
situated within close proximity, and there was no table at which he and his counsel
could converse because the game table was occupied by another inmate, who was
playing cards. *Id*.

Camacho then proceeded to testify about a November 10, 2014 visit that
occurred in the general seating area of the visiting room. *Id*. at 21.   Photos from that
visit show Camacho and his counsel as well as other visitors in the area and a
maintenance person accessing a nearby closet. *See Camacho Exhibit 18.*

Camacho also testified that he had a visit with his counsel and a
Spanish-speaking translator on January 17, 2015. *Doc. 84* at 23.   Camacho's counsel
showed video footage of that visit. *See Camacho Exhibit 25.*   The video shows
Camacho, his counsel, and the translator at the game table while numerous individuals
walk by the table or stand nearby waiting to use the restrooms. *Id.*   It also shows
inmates and visitors getting their photographs taken in front of a nearby screen as well
as inmates waiting to reenter the changing area. *Id.*

Finally, Camacho testified about his most recent visit with his counsel, which
occurred in noncontact booth number 2 the week before the hearing. *Doc. 84* at 26-27.
Counsel showed photos of the noncontact booths. *See Camacho Exhibit 20.*   In

13

Camacho's view, the conversation he had with his counsel in the booth was not private. *Id.* at 27.   He testified that soundproofing tiles cover only part of the booth on the prisoner side and he could hear conversations beyond the door of the booth. *Id.*   He also testified that from where he was sitting in the booth, he could only see counsel from the nose up and he could not see her hands. *Id.* at 27 & 31.   According to Camacho, when he stood up, he could see that the door on the attorney side of the booth was raised and he could see through the door to the floor beyond. *Id*. at 27-28. Camacho further testified that he and his counsel could not talk with each other through the slot in the booth, and therefore, they used the telephone. *Id*. at 30.   Without explaining why, Camacho testified that could not tell counsel what he needed to on the phone. *Id*. at 31.   He also testified that he and his counsel could not pass papers back and forth "very well." *Id.* at 28.

Camacho testified that the grievances that he submitted about his visits with his attorney had, in fact, been typed and prepared by his attorney, who sent them to him, and he then reviewed, signed, and submitted them. *Id*. at 31-33.   Camacho admitted that counsel sent the grievances to him again before the hearing in preparation for the hearing. *Id*. at 33.   When asked about the filing of his complaint in this matter, Camacho testified that he prepared the complaint with his counsel before it was filed. *Id*.   Furthermore, when asked if any of the claims in his complaint had been dismissed

14

or if he had received an adverse ruling on any of the claims, Camacho answered in the negative. *Id*. at 36-38.

Camacho was asked whether he wanted to add more information to his complaint, and he testified that he wished to add a claim requesting better medical treatment for his hand and arm. *Id*. at 41. He seemed somewhat confused when he was questioned about amending the complaint, and he expressed that he was not prepared because he and his counsel were not provided with a room in which they could talk about the things they needed to talk about. *Id*. at 38.

### 2. Carlton Lane.

The second witness to testify was Carlton Lane, another inmate at SCI-Huntingdon, who like the other inmate witnesses is represented by the same attorney as Camacho. He testified that he received a packet in the mail from counsel containing grievances he filed regarding his visits with counsel, *see Camacho Exhibit 2*, and he testified about the general features of the visiting room. *Doc. 84* at 51-54. Lane testified about his visits with counsel, including one on September 4, 2014 at the game table. *Id.* at 55. He testified that he and counsel had no privacy at the table because other individuals kept walking by the table and disturbing their "session." *Id*. During this visit, Lane and his counsel were attempting to draft a declaration and go

over some paperwork for an upcoming hearing. *Id*. at 56.   According to Lane, they could not complete the task, however, as he felt uncomfortable discussing the necessary matters because he was concerned that other individuals near the game table were eavesdropping. *Id*.

Lane also testified about the most recent visit he had with counsel on May 23, 2015, which took place in noncontact booth number 2. *Id*. at 56.   Lane described this booth; he testified that it has a phone, a plexiglas divider, and a slot similar to a mail slot, which could be used to pass documents back and forth. *Id*. at 56-57 & 65-66.   He also testified that it has sound dampening tiles on the upper portion of both the attorney side and the prisoner side of the booth. *Id*. at 65.   In Lane's view, the booth is not private; from inside the booth he could hear activity outside the booth, including visitors coming in and other inmates coming through the security area. *Id*. at 57. According to Lane, when looking through to the attorney side of the booth, he could see the officer's desk outside the door. *Id*. at 57.   When asked to describe the door on the attorney side of the booth, Lane testified that part of the door was made of glass, the other part of the door was "just door," and there was no insulation or padding on the door to the best of his recollection. *Id*. at 58-59.   Lane also testified that from a seated position in the booth, he could only see the top of counsel's head and he could not see when she used her hands to point to certain papers, nor could he see the papers

themselves. *Id.* at 61-62.   In Lane's view, he could not do the kind of work in the booth that he had done at the game table in September of 2014. *Id.*

Lane could "just barely" hear counsel through the booth's slot, and therefore, he communicated with her on the phone. *Id.* at 61.   Lane testified that he was not comfortable saying what he needed to say to counsel over the phone because he kept hearing sounds on the phone as they were trying to talk. *Id.*   Lane believes the phones in the visiting booths are monitored. *Id.* at 66.   He testified that he overheard people talking about it, and when on the phone, he heard sounds as if someone was picking up a receiver. *Id.* at 67-68.

Lane also testified about his own case in the Middle District against the Department of Corrections.   He sought an injunction about the visiting room at SCI-Huntingdon in that case, and his injunction request was denied. *Id.* at 63-64. Lane also testified that counsel prepared the grievances he filed about the prison's visiting room, and she was able to send them to him through the mail so that he could review them and ensure their correctness. *Id.* at 64.   Further, Lane testified that counsel was not on his call list, and if he added her to his call list, he would be able to call her even though she wouldn't be able to call him. *Id.* at 66.

### 3. Angel Luis Thomas.

The third witness to testify was Angel Luis Thomas, another SCI-Huntingdon inmate, who, like the previous witnesses, described the visiting room at SCI-Huntingdon by pointing out things that he recognized from a diagram of the room. *Id*. at 70-71.   Thomas also filed grievances about the prison's visiting room, *see Camacho Exhibit 3,* and he testified that he typed the grievances he filed himself with his own typewriter, but it was counsel who sent him, by mail, the copies of the grievances he had in front of him during his testimony. *Id*. at 80-81.

Thomas testified about his visits with counsel including a half-hour visit on October 30, 2014 in noncontact booth number 1. *Id*. at 71-72.   Thomas explained that during this visit, he and counsel had trouble talking with each other on the phone because it kept making a clicking sound and cutting in and out. *Id*.   Because of this, they ended up yelling at each other through the glass. *Id.*   They needed to yell because of the noise outside the booth. *Id*.   Thomas and counsel also had papers to work on during this visit, and, according to Thomas, when counsel wanted to give a paper to him, she would give it to a corrections officers, who gave the paper to another officer, who then handed the paper to him. *Id*.   Thomas expressed that during this visit, he was not able to accomplish everything he wished to accomplish because it "wasn't secure enough to try." *Id*. at 73.

18

Thomas also recounted his most recent visit with counsel, which occurred in noncontact booth number 2 on the Saturday before the hearing. *Id*. at 73.   He described the booth as containing ceiling tiles on the walls that started about four-and-a-half feet off of the ground and continued to the ceiling, and he explained that the door on the attorney side had open vents that allowed him to hear people outside the room talking as they went by as well as to hear a phone ringing outside of the room. *Id*. at 73.   Thomas also testified that there was a two-inch gap underneath this door, and it was not soundproof. *Id.* at 74.   He also testified that he could see through the door, and see people outside of the room walking by. *Id.*

Thomas further testified that the phones in this booth worked, but there was a constant buzzing noise over them. *Id*. at 73.   Thomas further described the sounds he heard outside the noncontact booth when he was trying to talk on the phone with counsel, and he testified that the sounds were coming from several different directions, including from the changing room behind him as well as from counsel's side of the booth. *Id*. at 83.

Additionally, Thomas testified that the booth contained a slot consisting of a small metal plate, a little door, and a hole for passing papers back and forth. *Id*. at 75. Thomas testified that he could not hear counsel through the hole. *Id.* at 75.   According to Thomas, he could hear better through the phones even though there was a lot of

background noise when using the phones. *Id.*   Thomas also testified that while sitting, he could see counsel only from her mouth up, and he had to stand up in order to see her point to any papers. *Id*. at 75.

### 4. Kevin Powell.

The fourth witness to testify was Kevin Powell, who was incarcerated at SCI-Huntingdon from September 2012 until August 2, 2013.[6] *Doc. 84* at 85.   Powell also is represented by the same attorney as Camacho. *Id.*   Powell testified that he visited with counsel more than five times while at SCI-Huntingdon, but only one of these visits was a contact visit. *Id*. at 85.   After his first and only contact visit with counsel, Powell was moved to a restrictive housing unit, and for his second visit with counsel, he was taken across the hall from his cell into a small room with a camera, TV, and a phone. *Id*. at 85-86.   There, Powell's hand was cuffed to a desk, the bottoms of his legs were shackled to a chair, and he visited and communicated with counsel through the TV and over the phone. *Id*. at 86.

Powell then recounted a specific video visit with counsel that occurred on May 17, 2013, during which counsel held a small piece of a paper up to the TV screen that

_____

[6]   Defense counsel objected to Powell testifying on a number of bases including relevance and competency.   We allowed Powell to testify.

read, "Happy birthday," and then she sang "Happy Birthday" to Powell over the

telephone. *Id*. at 86-87.   He testified that while counsel was singing to him over the

phone, he could hear someone, who he believed to be a corrections officer, listening in

on the phone. *Id*. at 88.

Powell testified that since he was released from custody in August 2013, he has

not been at or near SCI-Huntingdon. *Id*. at 91.   Therefore, he has not observed any

recent changes made to the noncontact booths.   *Id*.


**5. Ivan White.**

Ivan White, another SCI-Huntingdon inmate, was the fifth witness to testify at

the hearing.   Using the same diagram as previous witnesses, White explained the setup

of the visiting room, *doc. 84* at 96, and he testified about grievances that he filed

regarding visits with counsel. *See Camacho Exhibit 4*.   White testified that he drafted

the grievances himself and then mailed them to counsel so that she could type them up

on a computer. *Id*. at 102.   Counsel then sent the grievances back to White for his

review, and he signed and submitted them. *Id*. at 103.

Recounting a visit on August 30, 2013 in noncontact room 3, White testified that

he and counsel were only able to pass legal papers back and forth every fifteen minutes.

*Doc. 84* at 97-98.   According to White, the phone in the booth was not operable due to

static and crackling noises, and therefore, he and counsel were forced to talk to each other loudly. *Id.*   In addition, there was a pipe behind White's seat in the booth through which he could hear people talking in the inmate processing area. *Id.*   White testified that he was not able to discuss everything with counsel that he needed to because of the loud noise, the banging on the door on the attorney side of the booth, and the back-and-forth passing of legal documents, all of which White described as "discouraging and frustrating." *Id.* at 99.

White then recounted his most recent visit with counsel, which occurred on May 24, 2015, in noncontact room number 2. *Id.* at 99.   According to White, this visit was also not private because one could still hear noises and outside conversations on both the attorney and inmate side of the booth. *Id.*   White testified that the walls on his side of the noncontact booth were insulated on the top half only, and the same insulation was on the attorney side of the booth. *Id.* at 100.   Additionally, according to White, the door leading into the attorney side of the booth from the general visiting room had a window as well as open vents through which White could see the floor. *Id.*   Finally, White described the mail slot and he explained that he could only faintly hear counsel through the slot and that they had to speak standing up. *Id.* at 101.   Furthermore, White could not see counsel's hands through the slot, and, therefore, he could not see her point to certain papers. *Id.* at 101.

### 6. Bruce Cooper.

The sixth witness to testify was Bruce Cooper, who is currently an inmate at SCI-Dallas, but who was previously housed at SCI-Huntingdon as well as SCI-Smithfield. *Doc. 84* at 111.   Like the other inmate witnesses, Cooper testified about grievances that he filed about attorney visits at SCI-Huntingdon. *See Camacho Exhibit 7.*   He testified that he prepared one of his two grievances himself, while counsel prepared the other one and then sent it to him in the mail for his review, signature, and submission. *Id*. at 121-122.

Cooper testified that counsel met with him at SCI-Huntingdon multiple times from 2012 up until approximately June 2014. *Id*. at 118-120.   In addition, Cooper corresponded with counsel through the mail, but he did not put her on his call list until the end of 2014. *Id*. at 120.   Cooper testified that although he did not file any grievances about the SCI-Huntingdon visiting room until August of 2014, he had concerns prior to that, which he may have verbally made to prison staff members. *Id*. at 121.   Specifically, Cooper was dissatisfied that when he and counsel met at SCI-Huntingdon, they were placed in the middle of the visiting room, where they were unable to discuss anything relating to his case because there were many other people around them. *Id*. at 121.

Cooper also testified that he met with counsel two or three times at SCI-Smithfield to prepare for trial in his case in the Court of Common Pleas. *Doc. 84* at 116.   During those visits, he met with counsel in a separate room with a table, which they used to review papers and documents. *Id.*   According to Cooper, SCI-Smithfield has two separate rooms with a glass frame with a door and a table in each of them. *Id*. at 117.   No corrections officer sits in either of the rooms, and the corrections officer's desk is located outside of the room, approximately five to seven feet away. *Id.*   Cooper could not hear the corrections officer talking when he was inside the room, but he could see the officer if he turned around and looked out the glass window. *Id*. at 117-118.

### 7. Dr. Harriet Kaylor.

The seventh witness to testify was Dr. Harriett Kaylor, who for the past twenty-two years has volunteered as an official visitor for the Prison Society, a prisoner-advocate organization. *Doc. 84*. at 126.   Dr. Kaylor testified that she visits at both SCI-Smithfield and SCI-Huntingdon and that she is familiar with the visiting room at SCI-Huntingdon. *Id*. at 127.   She was present for all the prior testimony describing the visiting room at Huntingdon, and she stated that the prior testimony was generally accurate and that nothing else needed to be added for the court to better understand the room. *Id*. at 128.

24

Dr. Kaylor testified about photographs of the entrance and the outside visiting room, *see Camacho Exhibit 22*, and she testified about the multi-step process that a visitor goes through before entering the visiting room, which includes signing in, showing identification, getting a hand stamp, having that stamp checked, and going through a metal detector. *Id*. at 133-134.   Dr. Kaylor takes folders with her when visiting prisoners, and sometimes the folders are searched "cursorily" before she goes through the metal detector. *Id*. at 134.   Dr. Kaylor also testified about the process a visitor goes through when leaving the visiting room. *Id*. at 135.

Dr. Kaylor testified that the visiting room is open from 9:00 a.m. until either 3:00 or 3:30 p.m. every day except for Tuesdays and Wednesdays, which are not visiting days. *Id.*   Predictably, the visiting room is busier on weekends than on other days. *Id*. at 136.   During visiting hours, a visitor is not permitted to leave the visiting room when there is a shift change, and these changes can take up to forty-five minutes. *Id*.

Dr. Kaylor described visits she had in the past with prisoners in the noncontact booths at SCI-Huntingdon. *Id*. at 135.   She explained that it was very difficult to talk with prisoners on the phones in the booths, and sometimes it was actually easier for her to communicate with the prisoners by just reading their lips through the glass. *Id*.   Dr. Kaylor, who is not an attorney, has never visited with Camacho for legal purposes at the prison. *Id*. at 137.

25

**8. Jennifer Tobin, Esquire.**

The eighth witness to testify was Jennifer Tobin, Esquire, whom Camacho

proffered as an expert witness in the following areas: (1) DC-ADM 812, the

Pennsylvania DOC's visitation policy; (2) the American Correctional Association

(ACA) standards; (3) best practices for client contact in prisoner civil rights litigation;

(4) the Pennsylvania Rules of Professional Conduct; and (5) the attorney-client

privilege. *Id*. at 144-148.   Tobin, now a solo law practitioner, testified that she was

previously a prisoner-rights litigator for a Philadelphia nonprofit organization, and in

that capacity, she had inmate clients, who she would sometimes visit. *Id*. at 140.   She

estimated that she has visited eight to ten DOC prisons, two federal prisons, and three

or four county prisons. *Id*. at 140.   She testified that law students and fellows would

sometimes accompany her on visits to prisons, and she would meet with them ahead of

time to explain to them procedures for accessing the prison, the importance of the

visits, and how to conduct and behave themselves when meeting an inmate for the first

time. *Id*. at 141.   Even though Tobin left the nonprofit, she still does some

prisoner-rights litigation and consults with other attorneys who do this kind of work.

*Id*. at 141.

Tobin testified that she has never been qualified in federal court to testify as an

expert in any area. *Id.* at 144-149.   She also testified that she was not involved in the

drafting or implementation of   DC-ADM 812. *Id*. at 144-145.   Further, she has never

given any lectures or taught any individuals about that policy except for making her

interns aware of it prior to visits. *Id*. at 145.   She also testified that she was not a

member of any ACA committees or boards, nor has she ever served as an official

auditor, who would come into an institution and review its compliance with the ACA

standards, or a consultant, who helps a correctional facility prepare for an ACA audit.

*Id.* at 145-146.   Tobin further testified that she has never published any scholarly

articles about the ACA standards, about the best practices for client contact in prisoner

litigation, about the Pennsylvania Rules of Professional Conduct, or about the

attorney-client privilege, and she has never taught a CLE or lectured in any of those

areas. *Id*. at 146-149.   Nor has Tobin ever been a member of a board or advisory

committee that reviews or develops the Rules of Professional Conduct, a member of

the Pennsylvania Disciplinary Board, or any board or committee responsible for

developing the Federal Rules of Evidence. *Id*. at 148-149.

Based on Tobin's testimony, the Court held that she did not qualify to testify as

an expert, but she could testify as a lay witness. *Id*. at 157.   While Tobin testified

purportedly as a lay witness, her testimony nevertheless veered into opinion testimony.

She testified about her understanding of DC-ADM 812. *Id*. at 160-162.   Tobin,

who had been in the courtroom for the testimony of the other witnesses, testified that

based on that testimony and the exhibits she saw which displayed the visiting rooms, she was of the opinion that the architecture at SCI-Huntingdon was not compliant with DC-ADM 812. *Id*. at 163.   She was disturbed by the fact that in order to have a confidential visit, a prisoner would have to meet with his attorney in the booths, where contact was inhibited by a barrier, and in order to have a contact visit, the prisoner and attorney would have to meet in the general visiting room, where, according to her, there was no privacy or confidentiality. *Id*. at 163-164.

Tobin was shown video footage, *see Camacho Exhibit 26,* of the visiting room as it appeared during one of Camacho's visits with counsel and was asked her opinion on what she saw. *Id*. at 170.   She stated that the room she saw in the video was not an appropriate setting for an attorney-client meeting, and if she were in such a setting she would have felt uncomfortable and probably would have told her client not to share any confidential information, as there were other people around. *Id*.   Further, based on her experience with prisoners, Tobin testified that she believes that a prisoner would feel reticent to communicate sensitive information in such as setting, and she was very surprised by the setting of the visiting room she observed in the video. *Id*. at 170-171. She also testified that sometimes there is a perception in prison that if an inmate is talking to an attorney, he is a snitch, and being labeled a snitch "can create a real problem." *Id*. at 171.   While she was concerned about the privacy threat posed by the

28

multitude of cameras in SCI-Huntingdon's main visiting room, she also understood the necessity of having security cameras in a visiting room. *Id*. at 182-183. Tobin also testified that even if other individuals in the visiting room at the time of an attorney-client visit did not appear interested in what was going on, the mere presence of other individuals being close enough to hear can pose a problem for an attorney and client attempting to meet. *Id*. at 184.

Tobin testified that in her experience, writing letters is an inadequate way for attorneys to communicate with inmate clients, as such clients frequently have limited literacy, and they feel more comfortable talking in person. *Id*. at 172-173. She further testified that she can't get a sense of whether a client is believable or whether the client trusts her unless she meets him or her in person, and even when she does correspond with clients through letters, she follows up with them in person to make sure she correctly understands what they wrote. *Id*. at 173.

When asked to sum up her opinion of the evidence she observed at the hearing, Tobin testified that there did not seem to be any acceptable place to have an attorney-client meeting at SCI-Huntingdon, except possibly two unused video rooms, which, she acknowledged, would need reconfigured to have the wall between the rooms removed. *Id.* at 176-177. Tobin reached her conclusion because the visiting room, even on a non-visiting day, has cameras that, according to her, could observe

documents on the tables, and the noncontact booths had phones that, in her view, were faulty, forcing the attorney and client to yell at each other through the glass. *Id*. at 176. While Tobin expressed her belief that based on the other witnesses' testimony, she would not be able to effectively communicate with inmate clients in the noncontact booths at SCI-Huntingdon, she also admitted that she had never actually used the telephones in those booths. *Id*. at 181-182.

In fact, Tobin testified that she has never been to SCI-Huntingdon and that she was not aware that the facility has never failed an ACA accreditation. *Id*. at 178.

### 9. Captain Ronald Smith.

The next witness was Ronald Smith, who recently retired as a Captain from SCI-Huntingdon. *Doc. 85* at 6.   Smith testified that he recalled Camacho's counsel putting pressure on SCI-Huntingdon to provide different accommodations and expressing concern about privacy issues with the visiting room. *Id*. at 11-12; *See also Camacho Exhibit 27*.   On August 30, 2014, counsel told Smith that she had been frightened by a corrections officer striking the window of one of the visiting rooms in which she was seated. *Doc. 85* at 13.

Smith also testified about the prison's policy of using officers to pass papers between a visiting attorney's side of a noncontact booth and the inmate's side. *Id*. at 15.

He testified that, at one point, Camacho's counsel was asking officers to pass papers back and forth every minute or two. *Id*.   As such, according to Smith, the prison later implemented a policy that papers could be passed back and forth only every fifteen minutes, as they did not have enough staff to at the same time be both monitoring the visiting room and constantly passing papers back and forth. *Id*. at 14-15.   When asked why an additional corrections officer could not be assigned to the visiting room to assist in passing paperwork, Smith explained that the rest of the staff is busy monitoring the institution's two thousand inmates, and there is not enough staff to assign an extra officer to the visiting room. *Id*. at 18.   In addition, Smith testified that only two officers are assigned to the visiting room, but, he acknowledges, that when the visiting room population exceeds 120, the yard may be opened for visiting, in which case an additional officer is posted in the yard. *Id*. at 22.

Smith was then shown video footage of a visit between Camacho and his counsel that occurred on January 17, 2015 inside the visiting room, *see Camacho Exhibit 25,* and Smith explained what he saw on the video including himself walking around in the room. *Id*. at 21-25.   Smith also identified an officer's station located near the visiting room at which he and other officers stood and talked. *Id*. at 25-26.

### 10. Tabb Bickell.

The next witness to testify was Tabb Bickell, currently a deputy secretary for the central region of the DOC and formerly the Superintendent at SCI-Huntingdon from April 2011 to June 2014. *Doc. 85* at 35-36.   Bickell testified that SCI-Huntingdon complied with the DC-ADM 812 with respect to use of the visiting room and the conduct of attorney visits. *Id*. at 36-37.   He also testified that as Superintendent, it was ultimately his responsibility to oversee SCI-Huntingdon's compliance with DC-ADM 812. *Id*. at 40.   Bickell stated that the visiting policy does not allow monitoring of attorney conversations that occur on the phones and that the phone line at the prison is secure according to the maintenance manager. *Id*. at 40-41.   Other than the lines being secure, there is no way to ensure that calls are not being monitored. *Id*. at 41.

Bickell testified that each of the three noncontact visitation booths contain a two-way phone line that is not monitored, as the prison does not have the capability of listening in on the lines. *Id*. at 44.   Bickell further testified that on his most recent quarterly visit to SCI-Huntingdon, he observed the two-way phone system recently installed, but he could not give specific details about the placement of the phone's wiring. *Id*. at 49-50.   Upon questioning by the Court about support for his assertion that the phones at SCI-Huntingdon are not monitored, Bickell testified that he was basing that assertion on what he was told by the facility's maintenance manager, but he

did not know whether the phones in the visitation booths were attached to another master phone system. *Id*. at 51.   When asked about the crackling on the phones, Bickell stated that he assumed the crackling was due to the presence of old wiring at the facility and that crackling could even be heard on cell phones or personal phones used within the facility. *Id*. at 51-52.

Bickell further relayed that, while he was Superintendent, SCI-Huntingdon was evaluated by ACA auditors to maintain accreditation, it passed specific provisions relating to attorney access, and the accreditation has continued even since Bickell left his post as Superintendent. *Id*. at 45.   Bickell explained the accreditation process, which SCI-Huntingdon goes through every three years, most recently in October 2014 after being accredited prior to that in October 2011. *Id*. at 48.   In conducting their accreditation, evaluators visit the prison site and talk with both staff and offenders. *Id*. Bickell had not heard complaints from any legal professionals, other than Camacho's counsel, about SCI-Huntingdon's visiting accommodations, and, in fact, he had received some positive feedback from attorneys about the accommodations. *Id*. at 45-46.

### 11. Brian Harris

Camacho's counsel called Brian Harris, who has been the security captain at SCI-Huntingdon for approximately four years. *Doc.85.* at 53.   Harris recalled testimony he had given at the hearing in the *Lane* case during which he implied that the best way to reduce the amount of contraband that entered SCI Huntingdon would be to allow only noncontact visits or video conferences. *Id.* at 55.

Harris testified that one could see from the officers station into noncontact visiting booth 2 and that the distance between the officer's station and the booth is approximately seven or eight feet. *Id.* at 57-58. *See also Camacho Exhibit 20.*   Harris testified that the door to the booth has open louvers on the bottom half. *Id.* at 58-59. With respect to the booths' document slots, Harris testified that he did not believe that all of the booths had them, but they were a concern for him because they provide an opportunity for contraband to be passed to an inmate. *Id.* at 59.   When asked why the document slots were only three-eighths of an inch wide, Harris explained that three-eighths of an inch is sufficient to pass paper through, and in the interest of reducing the amount of contraband coming into the facility, the slots cannot be too large. *Id.* at 59-60.

Harris was shown some still images from November 10, 2014. *See Camacho Exhibit 19.*   In one photo, Harris identified an electronics specialist putting up a

34

ladder, but Harris was not sure whether the specialist was conducting maintenance or new construction. *Id*. at 61-62.   Further, Harris could not recall whether this photo was taken when the new phones were installed in the noncontact booths. *Id*. at 62.   In another photo, Harris identified a person on a ladder at a different location in the visiting room. *Id*.   This ladder was located near a door that led to noncontact booth number 1 and then booth number 2. *Id*.   Harris testified that he did not know whether the wires of the new phones in the booths went through to the officers' desk. *Id*. at 65.

Harris was asked to summarize what new additions had recently been made to the visiting booths and when these additions were made. *Id*. at 73.   He testified that the additions included sound-dampening tiles, two-way phones, and slots through which seventy-five pieces of paper can be passed. *Id.* at 73.   Harris recalled that the tiles were installed "many months ago," the phones were installed over a year ago, and the slots had been installed within the last month or so. *Id*.   Harris also testified that he oversees the monitoring of general phone calls within the prison and that to the best of his knowledge, there is no capability for attorney-inmate calls to be monitored, even those that take place in the noncontact booths. *Id*. at 74-75.   Further, Harris stated that something was placed over the vents on the bottom of at least one of the booth's doors,

but he was not exactly sure why this was done and he was not aware of other specifics. *Id*. at 75-76.[7]

### 12. Captain Ronald Smith (called by the defense)

To conclude the hearing, the defense called its only witness, Captain Smith, who Camacho had previously called as a witness.   Smith, who has a bachelor's degree in criminal justice, testified that he had twenty-seven years of corrections experience, and his responsibility at SCI-Huntingdon was to ensure the overall security of the facility and its inmates, staff, and visitors and to ensure the proper staffing and overall operation of the facility. *Doc. 85* at 84-85 & 104.   Smith testified that he was responsible for conducting vulnerability and security analyses for over seventeen different facilities and that, in his experience, the visiting room is one of the prime locations for the introduction of contraband into a facility. *Id*. at 87.   Thus, security cameras and corrections officers are used in the visiting room to mitigate the introduction of contraband. *Id*.

--------

[7]   Because shortly before Harris's testimony, defense counsel gave Camacho's counsel a packet of documents responsive to a subpoena, we gave Camacho's counsel leave to file an additional exhibit from that packet after the hearing.   Camacho filed Exhibit 28 after the hearing. *See Doc. 78.*   This Exhibit does not contain evidence helpful to the Court in deciding the motion for a preliminary injunction.

Smith described SCI-Huntingdon's visiting room as a long rectangular-shaped area with a sergeant-controlled front gate through which visitors enter. *Id*.   At about the midpoint of the room, visitors report to the officer at an officer's station located against one wall. *Id*. at 87-88.   On the other side of the room is a general visiting area with long rows of chairs that the visitors and inmates sit in to conduct their visits. *Id*. at 88.   Between the rows of chairs are tables, where visitors and inmates can eat, visit, play games, or share things permitted in the visiting area. *Id*.   All the furniture in the visiting room, except the officer's station, may be moved. *Id*. at 108-109.   There are cameras in the visiting room, some of which are visible. *Id.* at 109-110.   Other ceiling-mounted cameras are themselves not visible, but a protective globe covering the cameras can be observed on the ceiling. *Id*. at 110.   In addition, the visiting area includes the noncontact booths described throughout the hearing. *Id*. at 88.

Smith discussed attorneys' visits, and he testified that attorneys are subject to the same rules as any other visitors, except that an attorney is permitted to bring in paperwork, subject to a cursory search by staff to ensure the absence of contraband. *Id*. at 88-89.   When attorneys arrive to visit an inmate, they are asked if they want to have a contact visit with the client in the general visiting room or if they want to meet in a noncontact booth. *Id*. at 89.

Smith testified that all three noncontact booths are substantially similar, and each is basically a ten-by-ten room split in the middle by a partition that runs from floor to ceiling. *Id*. at 90.   There is also a table on each side of the partition, and for about the first foot above the table the partition is solid and then above that the partition is a Plexiglas-type material. *Id*. at 90; *Defense Exhibit 1*.   Each booth contains a phone used to facilitate communications between the visitor and inmate, and there is a chair on each side of the booth. *Id*. at 91-92.   Additional chairs can be requested, but because the booths are so small, they get crowded if there are more visitors. *Id*. at 92.

According to Smith, the noncontact booths are not directly monitored by surveillance cameras, and although some cameras have views of the doors to booths 1 and 2, the cameras are not able to peer directly inside any of the booths. *Id*. at 94-95. Smith also testified that the windows on the doors of the booths were placed there so that officers doing rounds on a regular basis can take a cursory glance into the room to ensure there are no problems with the visitors, as fights have occurred in the past. *Id*. at 95-96.

Smith testified about the recently added pass through slots in the booths. *See Defense Exhibits 4-6.*   He testified that they were recently installed into every booth, and, based on a performance test conducted by prison staff, he confirmed previous testimony that a stack of seventy-five papers could be passed through the slots. *Id*. at

96-97.   A slot is normally locked with a padlock, and if an attorney wants to pass

documents to a client, an officer unlocks the slot and then relocks the slot when the

attorney and client finish passing papers. *Id*. at 96-97.

Smith also testified about the acoustic material that was recently added to the

booths. *See Defense Exhibit 2*.   He estimated that on the attorney side of the booths,

sound-dampening tiles ran from floor to ceiling in one booth and about halfway from

the ceiling down in another booth. *Id*. at 92.   A similar but slightly lesser amount of

soundproofing tiles covers the walls on the inmate side of the booths; lesser tile is used

on the inmate side out of fear that inmates could hide contraband in the tiles. *Id*. at

92-93.   Smith explained that inmate janitors clean the area after visiting hours and if

contraband is hidden it can be picked up by the inmate janitor and taken into the

institution. *Id.* at 93.   One of the booths has some acoustic material over the door's

vent, but Smith did not know why that was in only one of the booths. *Id*. at 115 & 122.

Smith then explained the phone system in the noncontact booths.   He testified

that phone system is a dedicated system, with only a direct line between two receivers,

one on the attorney side and the other on the inmate side of the booth, and this system is

essentially an intercom system. *Id.* at 94.   Communication cannot occur unless both

receivers are picked up. *Id.*   The phones do not dial out to any other booth or any other

prison, and the prison does not receive a phone bill from a phone company for these

phones. *Id.* at 101-102.   Originally the booths had actual intercom boxes, rather than phone handsets. *Id.* at 117.   Then, black phone handsets were placed in the booths. *Id.* After maintenance received reports that those may not work properly, Smith decided to install the current, newer phone handsets. *Id.* at 116-117.   Smith himself has used the intercom phones. *Id.* at 120.

Smith was asked about the crackling noise on the booths' intercom phone system; and he testified that he experienced static problems with other intercom systems in the prison as well, and that it was possible that this was because the prison's phone system was a copper-based system. *Id.* at 100.   He testified that interference is possible with copper-based phone systems and that there are ways to dampen this interference. *Id.* at 123.   Smith did not know, however, whether any of the possible interference-dampening methods were being used at SCI-Huntingdon. *Id.*

Smith again testified that the phones in the booths are not monitored. *Id.* at 94. He conceded, however, that it was theoretically possible for there to be a phone tap that would not be visible on the photographs that were shown during the hearing. *Id.* at 123-124.

In addition to visits, Smith testified that an attorney could be in contact with his or her client through the mail. *Id.* at 102.   Mail from an attorney to an inmate is identified as privileged and is delivered directly to the housing unit. *Id.*   The inmate is

called down to an officer's station, the mail is opened by a staff member in the inmate's

presence, and the staff member does a quick fan of the mail to check for contraband. *Id.*

at 103.   The mail is then turned over to the inmate and is subject to no further search,

as far as Smith is aware. *Id.* at 103.

Smith also testified that an inmate can place a phone call outside of the

institution to an attorney. *Id.* at 103.   To do this, an inmate must submit a request

asking a counselor to place the attorney on the inmate's call list. *Id.*   Unlike other calls

from prisoners to outside parties, calls from inmates to attorneys are not monitored. *Id.*

A computer program identifies when an inmate is dialing an attorney's phone number,

and when this is the case, the system will not record or monitor the call. *Id.* at 130-131.

Inmates pay for phone calls outside of the prison to an attorney, but the inmate does not

pay when an attorney comes to talk to them face-to-face. *Id.* at 131.

Smith was asked about whether SCI-Huntingdon provides any resources to

assist illiterate or semiliterate inmates to write letters, and Smith testified that an

inmate could seek another inmate's assistance in writing a letter, but there is a general

policy in place that prison staff is not to assist in the writing of any correspondence for

an inmate. *Id.* at 124.   According to Smith, there are also legal aides in the prison's law

library who are bilingual and often assist inmates in filing papers, but Smith was unsure

whether policy actually required such bilingual assistance to be provided. *Id*. at 126-127.

## IV.   Preliminary Injunction Standard.

A motion for preliminary injunctive relief is governed by Rule 65 of the Federal Rules of Civil Procedure and is judged against exacting legal standards.   To obtain a preliminary injunction, a party "must satisfy the traditional four-factor test: (1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Miller v. Mitchell,* 598 F.3d 139, 147 (3d Cir. 2010).

Preliminary injunctive relief is not granted as a matter of right. *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982); see also *Thomas v. Pennsylvania Dep't of Corr.*, 3:13-CV-2661, 2014 WL 3955105, at *1 (M.D. Pa. Aug. 13, 2014)("An injunction is an 'extraordinary remedy' that is never awarded as of right.").   Rather, the decision to grant or deny such relief is committed to the discretion of the district court. *United States v. Price*, 688 F.2d 204, 210 (3d Cir. 1982).   Preliminary injunctive relief is an extraordinary remedy that places precise burdens on the moving party, and "[t]he preliminary injunction must be the only way

of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).   "It has been well stated that upon an application for a preliminary injunction to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937).   Further, when the requested preliminary injunctive relief "is directed not merely at preserving the *status quo* but . . . at providing mandatory relief, the burden on the moving party is particularly heavy." *Punnett v. Carter,* 621 F.2d 578, 582 (3d Cir. 1980). Mandatory injunctions should be used sparingly. *United States v. Price,* 688 F.2d 204, 212 (3d Cir. 1982).   Indeed, a request for mandatory proactive injunctive relief in the prison context "must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'" *Goff v. Harper,* 60 F.3d 518 (3d Cir. 1995)(quoting *Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir. 1982)).

These limitations on the power of courts to enter injunctions in a correctional context are further underscored by statute.   Specifically, preliminary injunctive relief in a civil action with respect to prison conditions must be narrowly drawn, extend no further than necessary to correct the harm, and be the least intrusive means necessary to correct that harm. *See* 18 U.S.C. § 3626(a)(2).   Also, in considering a motion for preliminary injunctive relief, the court must give substantial weight to

43

any adverse impact such relief may have on public safety or on the operation of the criminal justice system. *Id.*

## V.  Discussion.

Generally, "there must be 'a relationship between the injury claimed in the party's motion [for a preliminary injunction] and the conduct asserted in the complaint.'" *Ball v. Famiglio*, 396 F. App'x 836, 837 (3d Cir. 2010) (quoting *Little v. Jones,* 607 F.3d 1245, 1251 (10th Cir. 2010)(quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir. 1994)).   But when, as here, "the request for injunctive relief concerns a prisoner's access to the courts, 'a nexus between the preliminary relief and the ultimate relief sought is not required.'" *Lane*, 2015 WL 435003, at *7 (quoting *Parker v. Adu-Tutu*, No. CV 10-2747-PHX-GMS (ECV), 2012 WL 3150092, at *2 (D. Ariz. Aug. 2, 2012)).   Thus, although Camacho's complaint does not deal with the attorney visiting arrangements available at SCI-Huntingdon, because Camacho contends that those arrangements deny him access to the Court in this case, a relationship between the claims in the complaint and the preliminary injunctive relief requested is not needed, and we proceed to consider whether Camacho is entitled to a preliminary injunction.

## A.   Likelihood of Success on the Merits.

For an inmate to sustain his burden of proof that he is entitled to preliminary injunctive relief under Fed.R.Civ.P. 65, he must demonstrate a likelihood of success on the merits. *Abu-Jamal v. Price,* 154 F.3d 128, 133 (3d Cir. 1998); *Kershner v. Mazurkiewicz,* 670 F.2d 440, 443 (3d Cir. 1982).   "To establish a reasonable probability of success on the merits, the moving party must produce sufficient evidence to satisfy the essential elements of the underlying cause of action." *Sutton v. Cerullo*, 3:CV-10-1899, 2014 WL 3900235, at *5 (M.D. Pa. Aug. 8, 2014). Here, to satisfy his burden, Camacho must show a reasonable probability of success on the merits of his claim that the visiting arrangements at SCI-Huntingdon deny him access to the courts.

### 1. General Law Applicable to Access to the Courts and the *Turner* Analysis.

"Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts." *Monroe v. Beard,* 536 F.3d 198, 205 (3d Cir. 2008).   "An inmate's right of access to the courts encompasses the right to contact visits with his or her attorney." *Young v. Larkin*, 871 F.Supp. 772, 783 (M.D.Pa. 1994)(holding that the requirement that Young visit with counsel while handcuffed did not violate Young's right of access to the courts), aff'd 47 F.3d 1163 (3d Cir. 1995)(table);

*Ching v. Lewis*, 895 F.2d 608, 609 (9th Cir. 1990)(holding that "a prisoner's right of access to the courts includes contact visitation with his counsel").   But "this right does not necessarily entail unfettered or totally unrestricted visitation with counsel, for it must yield to legitimate penological interests." *Moore v. Lehman,* 940 F.Supp. 704, 708 (M.D.Pa. 1996)(holding that "neither the attorney visitation policy in general [relating to the requirement that an attorney's name appear on a prisoner's visiting list before the attorney can visit] nor the application thereof by SCI-Muncy officials violate Plaintiff Moore's right of access to the courts").   "Contact visitation with an attorney is merely one aspect of the broad and fundamental right of meaningful access to the court." *Casey v. Lewis,* 4 F.3d 1516, 1523 (9th Cir. 1993)(holding that the Arizona Department of Corrections' policy forbidding contact attorney visits for certain high-risk inmates was a reasonable response to legitimate institutional security concerns and did not violate the inmate's right of access to the courts).   To establish an access-to-the-courts claim, a party must show an actual injury. *Lewis v. Casey*, 518 U.S. 343, 349 (1996).   In the prison setting, actual injury is the loss of, or inability to pursue, a nonfrivolous claim that relates to a challenge, direct or collateral, to an inmate's conviction or relates to a challenge to the conditions of confinement. *Id.* at 354-55.   "Examples of actual injury include 'missing filing deadlines or being prevented from presenting claims.'" *Denney v.*

*Nelson*, 304 Fed. App'x. 860, 863 (11th Cir. 2009) (quoting *Wilson v. Blankenship*,

163 F.3d 1284, 1290 n.10 (11th Cir. 1998)).

"[W]hen a prison regulation impinges on inmates' constitutional rights, the

regulation is valid if it is reasonably related to legitimate penological interests."

*Turner v. Safley*, 482 U.S. 78, 89 (1987).   "Prison administrators . . . should be

accorded wide-ranging deference in the adoption and execution of policies and

practices that in their judgment are needed to preserve internal order and discipline

and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

"Such considerations are peculiarly within the province and professional expertise

of corrections officials, and, in the absence of substantial evidence in the record to

indicate that the officials have exaggerated their response to these considerations,

courts should ordinarily defer to their expert judgment in such matters." *Id.* at

547-48 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).   As the Court in

*Turner,* stated:

> Running a prison is an inordinately difficult undertaking that
> requires expertise, planning, and the commitment of resources,
> all of which are peculiarly within the province of the legislative
> and executive branches of government.   Prison administration
> is, moreover, a task that has been committed to the responsibility
> of those branches, and separation of powers concerns counsel a
> policy of judicial restraint.

*Turner,* 482 U.S. at 84-85.

The Court in *Turner* identified several factors to consider when determining the reasonableness of a regulation which impinges on a constitutional right, including: (1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forth to justify it; (2) whether there are alternative means of exercising the right that remain open to the prisoner; (3) the impact that an accommodation of the asserted right will have on guards and other inmates and on the allocation of prison resources generally; and (4) whether there are alternatives that fully accommodate the prisoner's rights at a *de minimis* cost to valid penological interests. *Id.* at 89-91.   "Although the *Turner* test was articulated in the context of challenges to prison regulations, as opposed to challenges to individual conduct, the analysis in the later context is the same." *Heleva v. Kramer*, 214 F.App'x 244, 247 (3d Cir. 2007).

The burden is on the prisoner to disprove the validity of the regulation or decision. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).   "This burden is 'heavy' because plaintiffs must overcome the presumption that prison officials acted within their 'broad discretion.'" *Monroe v. Beard,* 536 F.3d 198, 207 (3d Cir. 2008) (quoting *Shaw v. Murphy,* 532 U.S. 223, 232 (2001)).   While the ultimate burden of persuasion rests with the prisoner, it is the prison officials' burden to demonstrate a rational connection between the regulation or decision at issue and a valid

penological interest. *Fontroy v. Beard,* 559 F.3d 173, 177 (3d Cir. 2009).   "This burden is slight, and in certain instances, the connection may be a matter of common sense." *Sharp,* 669 F.3d at 156.   "[T]his burden, though slight, must 'amount to more than a conclusory assertion.'" *Wolf v. Ashcroft*, 297 F.3d 305, 308 (3d Cir. 2002)(quoting *Waterman v. Farmer*, 183 F.3d 208, 217 (3d Cir. 1999)).   If the government meets its burden, the court considers the other three *Turner* factors, and analysis of those factors is generally "fact-intensive." *Wolf,* 297 F.3d at 310.

### 2.   Defendants' Motion for a Decision on the Basis of Lack of Past Loss of a Claim.

At the close of Camacho's testimony, the defendants moved for the Court to rule in their favor because Camacho had not shown an actual injury to his right of access to the courts because the Court had not dismissed any of his claims or ruled against him on any issues in this case.   Thus, according to the defendants, Camacho cannot establish a reasonable likelihood of success on the merits of his access claim. Although we allowed the hearing to go forward, we stated that we would take the motion under advisement.   We now find that motion without merit because in connection with a forward-looking access claim, such as Camacho is presenting here, it is not necessary to show the actual past loss of a claim.

49

There are two general categories of actionable federal claims based upon an alleged denial of access to the courts. *Christopher v. Harbury*, 536 U.S. 403, 413 (2002).   The first category is forward-looking claims. *Id.*   The essence of such a claim is that official action is frustrating the plaintiff in preparing or filing a legal action at the present time. *Id.*   The opportunity to litigate "has not been lost for all time, however, but only in the short term; the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.*   The second category is backward-looking claims. *Id.* at 413-14.   Such a claim does not look forward to future litigation, "but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id.* at 414 (footnotes omitted).   "The ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future." *Id.*

The ultimate justification for recognizing each kind of access claim is the same. *Id.*   "Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek

judicial relief for some wrong." *Id.* at 414-15.   The right of access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id.* at 415.   Therefore, a plaintiff must establish an actual injury by identifying a nonfrivolous, arguable underlying claim blocked or lost by the alleged denial of access to the courts. *Id.*   The underlying cause of action, whether anticipated or lost, is an element of the access claim. *Id.*

In this case, Camacho is presenting a forward-looking claim, i.e., a claim that he cannot go forward with this case unless he has confidential contact visits with his counsel.   Thus, he need not show that he has already lost a claim.   Instead, to show a reasonable likelihood of success on the merits, he must show that he is denied such visits and that such denial will likely prevent him from proceeding with this case.

### 3.   Camacho Can Have Confidential Contact Visits With his Attorney at SCI-Huntingdon.

The evidence presented at the hearing shows that Camacho can have confidential contact visits with his attorney at SCI- Huntingdon at the game table in the visiting room.[8]   Based on all the evidence presented at the hearing including the

---

[8]   In addition, attorney-client visits may take place in the general seating area in visiting room or at the children table in the visiting room.   After seeing video of the children's table, at the hearing we concluded that the children's table was not an appropriate place for confidential attorney-client visits. *See Doc. 84* at 175.   Also,

videos and still photos, we conclude that, although not an ideal location, the game

table provides the ability of an inmate to confer confidentially with his attorney.

---

given the congestion of the general seating area of the visiting room and the ability of certain cameras in that area to zoom in and possibly read the print on papers, we conclude that the general seating area in the visiting room does not provide the ability of an inmate to confer confidentially with his attorney.   Thus, we do not address the children's table or the general visiting room further.   Camacho can also meet confidentially with his attorney in one of three non-contact attorney booths. But given the architecture of those booths, any such visit is not a contact visit.   We assume without deciding that as part of access to the courts, an inmate is entitled to confidential contact visits with his attorney.   We note, however, that many of the cases so stating do so without an in depth analysis of the right of access to the courts outside the context of a right to meet with counsel regarding ongoing criminal proceedings, which implicate the Sixth Amendment right to counsel.   The Sixth Amendment does not apply in civil cases. *Turner v. Rogers*, 131 S. Ct. 2507, 2516 (2011)("[T]he Sixth Amendment does not govern civil cases.").   Thus, those cases cited by Camacho that deal with access to counsel under the Sixth Amendment are inapplicable.   Citing *Wolff v. McDonnell*, 418 U.S. 539, 579-80 (1974), Camacho contends that "prisoners have the same rights to legal assistance in civil-rights litigation as they do in criminal defense and appeal." *Doc. 30* at 18.   *Wolff*, however, had nothing to do with attorney-client visits.   The section of *Wolff* cited by Camacho deals with legal assistance to prisoners by other prisoners, and in that context, the Court held that *Johnson v. Avery*, 393 U.S. 483, 490 (1969)(holding that "unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation such as that here in issue, barring inmates from furnishing such assistance to other prisoners"), applied to civil-rights action as well as habeas corpus petitions. *Id.* at 578-80.   To the extent that Camacho suggests that the same standards that are applicable under the Sixth Amendment are applicable in noncriminal cases, we reject that suggestion.   In fact, in a different section of *Wolff*, where the Court dealt with the opening of mail from attorneys, the Court noted that "[a]s to the Sixth Amendment, its reach is only to protect the attorney-client relationship from intrusion in the criminal setting . . . ." *Id.* at 576.

52

The game table is to the one side of the path that visitors entering the visiting room use to get to the main portion of the visiting room.   Thus, at times there is a lot of foot traffic by visitors—adults and children—past the game table.   At times, there are also corrections officers that walk past the table, and the visiting room officer's desk is not too far from the table.[9]   There are also times when other inmates walk past the table or sit at nearby chairs waiting to be allowed back into the changing area for prisoners or the bathroom.   Further, there are times when there is an inmate nearby taking photographs of other prisoners and visitors.

Yet, from the evidence that was presented at the hearing, with the exception of one woman visitor who briefly (less than a minute) appears to have been looking in the direction of the game table while waiting to use the bathroom,[10] people that passed by the game table did not take any interest in what was going on at the table. We did not observe anyone trying to eavesdrop on the conversation between Camacho and his counsel or trying to look at the papers they were reviewing. Further, there are no guards posted in a position from which it could reasonably be expected that that they could hear the conversation going on at the game table or see the documents being reviewed by the prisoner and his attorney.   Further, there was

---

[9]   According to a diagram of the visiting room submitted by Camacho, the officer's desk is approximately 20 feet from the game table. *See Exhibit 13.*
[10]   *See Exhibit 26 (video clip 1),* view from Camera 212 at 12:00:45 to 12:01:42.

no evidence presented at the hearing that would lead to a reasonable inference that the cameras in the visiting room are able to zoom in to such a degree to read papers on the game table.[11]

Based on the evidence in the record, we conclude that Camacho and his counsel can reasonably use the game table to speak confidentially during contact visits.   Although there is a lot of traffic that passes near the game table, we echo Judge Caputo's conclusion in *Lane* that, although not ideal, the game table can accommodate confidential communication with counsel.[12]

---

[11]   At the hearing, Camacho showed a series of still photos taken from a surveillance video showing Camacho and his counsel at the game table reviewing papers. *See Exhibit 16.*   One of those still shots was a zoomed-in view.   Although we could see that Camacho and his counsel were reviewing papers, we could not read the print on the papers.   And Camacho has not presented any other evidence suggesting that the cameras have the capability to zoom in to such a degree as to be able to read papers on the game table.

[12]   In *Lane*, Judge Caputo concluded that Lane and his counsel could use the game table for contact visits:

> Although this table is in the general visiting area and Lane and his attorney may need to interrupt their conversations to maintain privacy when visitors, officers, or inmates approach, testimony presented at the hearing provided that this area is generally kept clear of other visitors and inmates.   Moreover, while such an arrangement may not be ideal, SCI–Huntingdon does not limit the length or number of visits between an inmate and attorney, thus minimizing any adverse impact caused by this arrangement.

*Lane*, 2015 WL 435003, at *11.

### 4.   Camacho Can Also Meet Confidentially with his Cousel in the Attorney Booths at SCI-Huntingdon.

The three attorney booths also provide a space for Camacho and his counsel to confer confidentially.   Based on the evidence presented at the hearing, we find that those booths contain an intercom system through which an inmate and his counsel can communicate confidentially.   Although there was evidence that there is static and crackling noise on the intercom system and some of the witnesses testified that at times it was hard to hear on the intercom system, based on the testimony as a whole, we find that the intercom system works.[13]   Further, the handsets on the intercom system were replaced within the last year, and so testimony regarding use of the intercom system before that is not particularly probative.[14]   Moreover, while several inmate witnesses testified that they were uncomfortable using the intercom system because they thought the system may be monitored, there was no evidence

_____

[13]   Angel Luis Thomas testified that when he met with counsel in booth 2 near the end of May of 2015, the phones worked other than constant buzzing. *Doc.* 84 at 73.
[14]   Captain Smith testified that phones handsets were put in the booth after the maintenance department had some concerns about whether the phones were working properly. *Doc. 85* at 116.   Given the replacement of the handsets, we do not find helpful Harriet Kaylor's testimony that at some unspecific dates in the past she met with inmates in the noncontact booths, and it was difficult to hear over the intercom system. *See Doc. 84* at 135.

presented to support such a belief.   And we find credible the testimony of Captain

Smith and Captain Harris that the intercom system is not monitored.

Further, in response to concerns of Camacho's counsel, prison officials

recently added some acoustic tile on the walls of the attorney booths and the door to

one of the booths.   Still, the attorney rooms are not completely sound proof and

Camacho presented evidence that while in the rooms one can hear a lot of noise that

is going on outside the booths.   But there was no evidence presented that a normal

conversation between an inmate and an attorney can generally be heard outside the

booth.   Moreover, while there are times when, for security reasons, the

visiting-room officer looks into the booths, there was no evidence that an officer is

posted sufficiently near the rooms to hear a normal conversation or that when the

officer looks in it is for more than a few seconds to confirm that everything is alright

in the booth.[15]

Several inmates testified that because of the barrier in the booths, when seated

all they could see of counsel was her head; they could not see her hands or papers

---

[15]   Although the visiting room officer's desk is a few feet from the door to one of the
booths and it has a view into the window of that booth, there was no evidence from
which we could reasonably conclude that the officer has ever listened in on a
conversation between Camacho and his counsel or, even if so inclined, given the
other activity in the visiting room, the officer could do so.   Moreover, there was no
evidence presented that the officer could read papers being passed between the
prisoner and attorney.

laid on the desk in front of her.   But, in response to concerns of Camacho's counsel,

SCI-Huntingdon recently installed a document slot in the booths.   The evidence at

the hearing established that those slots can be used to pass papers (up to 75 pages at

a time) between the inmate and his counsel.

Because of the lack of complete soundproofing and the crackling and static

with the intercom system, like the game table, the attorney booths are not ideal for

attorney-client conferences.   Yet, like with the game table, we conclude that

Camacho can meet confidentially with his counsel in the attorney booths.

### 5.   The Accommodations that Camacho Seeks.

Camacho, however, is not satisfied with meeting with his attorney at the game

table or in the attorney booths.   Rather, it appears that Camacho is seeking either a

private room with a table and without a barrier where he can meet with counsel or

further modifications to the attorney booths such as enlarging the documents slot.

Considering Camacho's request for such modifications under the *Turner* analysis,

he fails to establish a reasonable probability that he will succeed on the merits of his

claim of denial of access to the courts.

The first *Turner* factor is whether there is a "valid, rational connection"

between the prison regulation and the legitimate governmental interest put forth to

justify it.   Here, the defendants point to safety and security concerns with making the changes suggested by Camacho.   The defendants have presented evidence that contraband can be introduced into the institution through visits.   Contraband in prison presents security concerns, and security is a legitimate penological interest. *See Smith v. Kyler,* 295 F.App'x 479, 481 (3d Cir. 2008)(stating that maintaining security is a legitimate penological interest); *Pell*, 417 U.S. at 823 ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.").

We credit Captain Harris's testimony that, for security reasons, the slot in the booths can not be too large or it may permit contraband to be passed to an inmate. And the slot, as presently designed, accomplishes its purpose, which is to allow the attorney and inmate to pass documents back and forth.[16]

Further, as a matter of common sense, the refusal to provide a private room for contact visits or to widen the document slot in the existing attorney booths serves the "interests of protecting safety of the public, inmates, and staff members, in addition to preventing the introduction of contraband to the facility." *Lane*, 2015 WL 435003,

---

[16]   The testimony elicited by Camacho that it is difficult to carry on a conversation through the slot is beside the point as the purpose of the slot is to allow papers to be passed back and forth, not to facilitate verbal communication.

at *9.   Thus, the defendants have satisfied their burden at the first step of the *Turner* analysis.

The second *Turner* factor requires the court to examine whether the inmate has alternative means of exercising the right in question generally, "not whether an inmate has alternative means of engaging in the particular practice in question." *Dehart v. Horn,* 227 F.3d 47, 55 (3d Cir. 2000).   "Where 'other avenues' remain available for the exercise of the asserted right, . . . courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Turner*, 482 U.S. at 90 (quoting *Pell v. Procunier,* 417 U.S. 817, 827 (1974)).   If alternative means of accessing the courts are available, that fact tends to support the conclusion that the decision at issue is reasonable.

Here, Camacho has alternative means of accessing the court.   As already discussed, he can meet confidentially with his counsel either at the game table or in one of the attorney's booths.   Further, he can communicate confidentially with his counsel by mail or phone.   Finally, 'there is nothing in the record suggesting that he has been deprived of the use of an 'adequate law library or adequate assistance from persons trained in the law.'" *Lane,* 2015 WL 435003, at *10 (quoting *Casey v. Lewis*, 4 F.3d 1516, 1522 (9th Cir. 1993)).   In sum, "inmates can 'express' their

rights to meaningful access without attorney contact visitation." *Casey,* 4 F.3d at 1522.   Because Camacho has alternative means of exercising his right to access to the courts, the second *Turner* factor weighs in favor of finding the defendants' actions reasonable.

The third *Turner* factor analyzes the impact that an accommodation of the asserted right will have on guards and other inmates and on the allocation of prison resources generally.   The fourth *Turner* factor is whether there are alternatives that fully accommodate the prisoner's rights at a *de minimis* cost to valid penological interests.   These factors focus on the specific practice at issue and "the consequences of accommodating the inmate for guards, for other inmates, and for allocation of prison resources." *DeHart,* 227 F.3d at 57.

At the hearing, inmate Bruce Cooper testified about the attorney-client visiting accommodations at SCI-Smithfield.   He testified that during visits at SCI-Smithfield, he met with counsel in one of two separate rooms with a table.   Camacho suggests that because SCI-Smithfield permits confidential contact visits in a private room without a barrier, SCI-Huntingdon's refusal to do so represents an exaggerated response to prison concerns.   But Camacho fails to account for the fact that SCI-Huntingdon is a

much older institution than SCI-Smithfield.[17]   And he has not presented evidence

regarding how difficult or costly—not only in terms of money but in terms of security

interests—it would be to retrofit SCI-Huntingdon to meets his demands.   He does

suggest that unused video rooms at SCI-Huntingdon could be used for a private

attorney conference room.   But it does not appear from the photos shown at the

hearing that either of those rooms would be large enough to accommodate a table, and

again he has not presented evidence about the costs to remodel those rooms to serve

that purpose.   Moreover, as Judge Caputo stated in *Lane,* "while the private attorney

conference room . . . may be constructed at SCI-Huntingdon in the 'direct line of sight

from the officer's desk' and 'this proposal may suffice to stem the flow of contraband,'

'it fails adequately to address the potential problem[ ] of . . . injury to staff and visiting

attorneys.'" *Lane,* 2015 WL 435003, at *10 (citations omitted).   Because Camacho

has not presented evidence that the changes that he is seeking can be done with *de*

*minimis* costs, we cannot conclude that SCI-Huntingdon's policy regarding the

attorney-client visiting accommodations is an exaggerated response to its legitimate

security concerns.

---

[17]   According to the Pennsylvania Department of Corrections' website,
http://www.cor.pa.gov/Facilities/StatePrisons/Pages/default.aspx (last visited July 20,
2015), SCI-Huntingdon was originally opened in 1889, while SCI-Smithfield was not
opened until 1988.

In sum, after consideration of the *Turner* factors, we conclude that Camacho has failed to establish a reasonable probability of success on the merits of his access-to-courts claim.   Accordingly, he is not entitled to a preliminary injunction. *See Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) ("The moving party's failure to show a likelihood of success on the merits 'must necessarily result in the denial of a preliminary injunction.'")(quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982)).

## B.   Irreparable Harm.

In addition to failing to establish a reasonable probability of success on the merits of his access claim, Camacho has failed to establish irreparable injury.   To establish irreparable injury, "the moving party must establish that the harm is imminent and probable." *Stilp v. Contino*, 629 F. Supp. 2d 449, 466 (M.D. Pa. 2009). "The mere risk of injury is not sufficient to meet this standard." *Id.*   And the burden of showing irreparable injury "is not an easy burden" to meet. *Moore v. Mann*, 3:CV-13-2771, 2014 WL 3893903, at *2 (M.D. Pa. Aug. 7, 2014).   Because, as discussed above, Camacho can met confidentially with his counsel at SCI-Huntingdon, he has failed to meet the heavy burden of showing that he will be

irreparably injured if the court does not issue the mandatory injunction that he is seeking.[18]   For this reason also he is not entitled to a preliminary injunction.

While we understand Camacho's frustration with the less than ideal conditions for attorney-client visits at SCI-Huntindgon, he has not established that they deny him access to the courts.   In sum, Camacho has not demonstrated that he is entitled to the extraordinary relief that he seeks.   An assessment of the factors which govern issuance of such relief under Fed.R.Civ.P. 65 weighs against Camacho and compels us to recommend that the Court deny his motion for a preliminary injunction.

---

[18]   As set forth above, the burden on a party seeking a mandatory injunction, which changes the *status quo*, is particularly heavy.   Camacho's argument that he is merely seeking to preserve the *status quo* that existed prior to his counsel entering her appearance for him is meritless given that he has presented no evidence that the visiting arrangements at SCI-Huntingdon ever contained the accommodations that he is now seeking.

## VI.   Recommendations.

For the foregoing reasons, we recommend that Camacho's motion (doc. 13) for a preliminary injunction be denied and that the case be remanded to the undersigned for further proceedings.[19]

Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.   Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.   The briefing requirements set forth in Local Rule 72.2 shall apply.   A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.   The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.   The judge may also receive

---

[19]   We stayed the case management deadlines pending a decision on the motion for a preliminary injunction. *See Doc. 33.*   Upon remand, we will hold a status conference with counsel to establish new case management dates and deadlines.

further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 22nd day of July, 2015.

_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge